# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 21-0091V

|  |  |
|---|---|
| MATTHEW HUBER, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: October 26, 2023 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*John Robert Howie, Howie Law, PC, Dallas, TX,* for Petitioner.

*Rachelle Bishop, U.S. Department of Justice, Washington, DC,* for Respondent.

## <u>DECISION AWARDING DAMAGES</u>[1]

On January 5, 2021, Matthew Huber filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered a left shoulder injury related to vaccine administration ("SIRVA") following his receipt of an influenza ("flu") vaccine on September 18, 2020. While Respondent conceded entitlement, the parties were unable to resolve the appropriate award of damages, so I ordered briefing on the subject.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons described below, I find that Petitioner is entitled to an award of **$71,247.78 (representing $70,000.00 for actual pain and suffering, plus $1,247.78 for actual unreimbursable expenses).**

## I.   Relevant Procedural History

Four months after initiating the claim, Petitioner filed an Amended Petition (ECF No. 8) incorporating the required medical records and his first sworn statement, filed as Exs. 1 – 9 (ECF No. 9). In October 2021, the case was activated and assigned to SPU. ECF No. 15. In May 2022, Petitioner submitted a demand. ECF No. 22.

On February 22, 2023, Petitioner was found entitled to compensation for a Table SIRVA, consistent with Respondent's recommendation. ECF Nos. 30 – 31. But one week earlier, Petitioner had filed a second sworn statement as Ex. 11 (ECF No. 28), and a motion for a ruling on the record regarding damages (ECF No. 29) (hereinafter "Brief"). Petitioner reported that he had rejected Respondent's "non-negotiable proffer." ECF No. 34. On April 27, 2023, Respondent filed a Response. ECF No. 36. On May 12, 2023, Petitioner filed a Reply. ECF No. 37. The matter is ripe for adjudication.

## II.   Authority

Under the Vaccine Act, the petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Compensation shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision of the Court of Federal Claims several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* instead emphasized the importance of assessing pain and suffering by looking to the record evidence specific to the injured individual, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

I have periodically provided (in other published decisions) statistical data on pain and suffering for SIRVA claims resolved in SPU. *See, e.g., McKenna v. Sec'y of Health & Human Servs.*, No. 21-0030V, 2023 WL 5045121, at *2-3 (Fed. Cl. Spec. Mstr. July 7, 2023). As noted in *McKenna*, as of July 1, 2023, in 173 SPU SIRVA cases that required reasoned damages determinations, compensation for past pain and suffering ranged from $40,000.00 to $215,000.00. *Id.* at *3. Cases with higher pain and suffering awards involved prompt medical attention; high subjective pain ratings; moderate to severe limitations in range of motion; significant findings on MRI; surgery or significant conservative treatment; and evidence of permanent injury. *Id.* at *3.

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

### III.    Appropriate Compensation for Petitioner's Pain and Suffering

#### A.  Consideration of the Evidence

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult, with no impairments to his mental faculties or capacity. I therefore analyze principally the severity and duration of Petitioner's injury. In performing this analysis, I have reviewed the record as a whole, including all medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I also have taken into account prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and rely upon my experience adjudicating these cases. However, I base my ultimate determination on the specific circumstances of this case.

The medical records establish that Mr. Huber was 36 years old and in good health upon receiving the subject vaccine in his dominant left arm on September 18, 2020. Ex. 2 at 1.

Eighteen (18) days later, on October 6, 2020, Petitioner saw his primary care physician ("PCP") for a chief complaint of acute left shoulder pain. Ex. 5 at 9. He described normal stiffness the day after receiving his vaccination, which had gotten progressively worse, although no redness or swelling was noted. *Id.* The pain was currently "moderate," and "really hurt[ing] with movement of the left shoulder/ upper arm, specifically lifting overhead. *Id.* He had been taking Tylenol and Advil, which didn't really help. *Id.* The positive exam findings were: "Pain with ext[ernal] rot[ation] and flexion but full ROM in those directions; pain with abduction with decreased motion to approx. 160 2/2 pain," as well as positive Hawkins-Kennedy and Neers impingement tests. *Id.* at 10. The PCP's tentative assessment was tendinitis aggravated by the flu shot. *Id.* The PCP prescribed oral steroids (a Medrol dose pack) and instructed Petitioner on home exercises. *Id.* Petitioner declined formal physical therapy ("PT") at that time. *Id.*

Two weeks later, Petitioner reported that the steroids had delivered no relief. Ex. 5 at 38. An x-ray revealed an "unremarkable" left shoulder. *Id.* The PCP recorded that Petitioner had "declined [a referral to PT] … to [instead] see ortho and MRI." *Id.* at 11 – 12.[4, 5]

At the October 30, 2020, orthopedics initial evaluation, Petitioner reported an

---

[4] While the primary care records list two "encounters" on October 22, no updated history, review of systems, or examination are recorded. Ex. 5 at 11 – 12.

[5] Petitioner never underwent an MRI. Brief at 21.

"ach[iness]" after the September 18th vaccination which had not let up. Ex. 7 at 3. He described the pain as "moderate to severe," but also as "fluctuating" and "intermittent." *Id.* The pain was aggravated by bending, lifting, and pushing – and relieved with ice, over-the-counter medications (specifically Advil), rest, and stretching. *Id.* Petitioner also reported difficulty sleeping. *Id.* On exam, his left shoulder had normal strength and reflexes, essentially normal range of motion,[6] but positive Hawkins-Kennedy and Neers impingement tests. *Id.* at 4. The orthopedist assessed an inflammatory reaction from the flu shot and "impingement-like symptoms," to be treated initially with Meloxicam for 7 – 10 days, home exercises, and a reevaluation in 6 – 8 weeks. *Id.* In formulating this treatment plan, the orthopedist "discussed sometimes this *can* stiffen up over time." *Id.* (emphasis added).

On November 25, 2020, the PCP recorded that Petitioner's shoulder pain was improved but still present; he had been doing home exercises and taking non-steroidal anti-inflammatory drugs ("NSAIDs") as needed. Ex. 5 at 13. The PCP specifically noted that an exam of the left shoulder revealed no tenderness, no pain, and intact range of motion. *Id.* at 15. The PCP recommended continuing home exercises and following up with the orthopedist. *Id.*

The November 25, 2020, PCP encounter was for an annual evaluation. The PCP recorded that Petitioner had a good energy level, was sleeping 8 hours per night, and was exercising 3 – 4 times per week. Ex. 5 at 13. The PCP also recorded that Petitioner's wife was "having first baby in Feb," *id.* at 13, and accordingly, Petitioner received a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine. *Id.* at 15.[7, 8]

At a December 10, 2020, orthopedics follow-up, Petitioner reported that Meloxicam had delivered "mild temporary relief," he was not taking additional pain medications, his pain was unchanged; and his ROM was improved but still painful. Ex. 7 at 5. He also reported left shoulder "soreness," pain with overactivity, and pain at night. *Id.* at 6. He was not able to play tennis, noting that the injury was to his left dominant side. *Id.* The exam findings were unchanged. *Id.* The orthopedist administered a subacromial steroid injection, and recommended formal PT followed by a reevaluation in 7 – 8 weeks. *Id.*

---

[6] Except for a slight difference in active external rotation and flexion – documented as 160 degrees in the left shoulder, compared to 165 degrees in the right. Ex. 7 at 4 (noted in Petitioner's Brief at 6).

[7] The Centers for Disease Control and Prevention ("CDC") encourages vaccination against pertussis (also known as whooping cough) for individuals who plan to be around babies, who are particularly vulnerable to this disease. CDC, *Pertussis (Whooping Cough)*, https://www.cdc.gov/pertussis/vaccines.html (last accessed Oct. 24, 2023).

[8] The Tdap vaccine's administration site is not recorded. *See generally* Ex. 5 at 13 – 16.

At the December 14, 2020, PT initial evaluation, Petitioner reported that his left shoulder "ache[d] in the morning when [he woke] up on that side." Ex. 8 at 8.[9] The steroid course had helped for a while, Meloxicam made no difference, and the steroid injection "may have helped." *Id.* His pain was currently 3/10 and ranged from 0 – 5/10. *Id.* His functional limitations were pain with sleeping, an inability to play tennis, and pain with reaching behind. *Id.* His goals were to return to tennis and activities of daily living ("ADLs") without pain. *Id.* The PT initial examination found that the left shoulder had mildly decreased and painful active ROM and gross muscle testing, and positive Hawkins-Kennedy and Neers impingement tests. *Id.* at 9. The therapist's assessment was left rotator cuff impingement and tendinitis, for which she recommended formal PT sessions twice a week for 8 weeks – which began that day – and adherence to a home exercise program. Ex. 8 at 10; *see also id.* at 16 – 37.

By January 21, 2021 (at the 12th PT session), Petitioner reported that his left shoulder was "definitely getting better, but still ha[d] pain with reaching out to the side and behind with certain activities like washing my back." Ex. 8 at 38. His pain was currently 2/10 and ranged from 0 – 4/10. *Id.*

At an orthopedics follow-up the next day, Petitioner reported "no relief" from the steroid injection, "mild relief" from the Meloxicam – which prescription had run out. Ex. 9 at 4. He was not taking any other pain medications. *Id.* PT was improving his shoulder function, specifically ROM, but he continued to have pain with certain movements. *Id.* The orthopedist's exam findings were unchanged, but he recorded that Petitioner was "slightly better" and did "not appear to be freezing up." *Id.* at 4 – 5. The orthopedist ordered additional PT, Naproxen "at night periodically," and reevaluation in two months. *Id.*

Petitioner continued to report pain relief from taking Naproxen at subsequent PT sessions. *See, e.g.*, Ex. 8 at 41. He progressed with decreased frequency and intensity of symptoms, improved mobility, and increased weight on resistance exercises. At his 19th PT session on February 25, 2021, Petitioner reported: "My wife had our baby on Monday. The shoulder feels okay after trying to hold the baby." *Id.* at 56.

At a March 18, 2021, orthopedics follow-up, Petitioner confirmed that Naproxen relieved his pain and that his ROM was better, but he continued to work on external rotation in PT. Ex. 9 at 6. The orthopedist's exam findings were unchanged, but he noted "some stiffness in abduction external rotation," for which he administered an intra-articular steroid injection and recommended further PT. *Id.* at 7. The orthopedist assessed that

---

[9] Petitioner attended a total of 27 PT sessions – beginning on December 14, 17, 21, 22, 28, and 30, 2020. In the following year, further sessions occurred on January 4, 7, 11, 14, 18, 21, 25, 28; February 4, 8, 11, 15, and 25; and March 1, 4, 8, 15, 18, 23, 25, and 29, 2021. *See generally* Ex. 8.

"Overall, [Petitioner] is doing dramatically better, it is a matter of time." Ex. 9 at 7; *see also* Ex. 8 at 68 (orthopedist's order for additional PT 2 times per week for 6 weeks); Ex.

By a PT session a few days later, Petitioner still had pain at night, with reaching overhead, out to the side, and behind his back. Ex. 8 at 69. The pain was currently 1/10 and ranged from 0 – 3/10. *Id.* After attending two more sessions on March 25 and 29, 2021 (representing 27 sessions total), *see id.* at 74 – 78, Petitioner discontinued PT. No formal discharge summary appears in the record.

Petitioner sought no further treatment after the end of March 2021 – although he has alleged ongoing pain and adherence to a home exercise program. *See* Status Report filed Jan. 3, 2022, ECF No. 19. In February 2023, Petitioner represented[10] that his left shoulder injury did not impact his ability to perform his job,[11] but he had been compelled to adjust his schedule while attending formal PT, which took a few hours each week. Ex. 11 at ¶ 4. In addition, his formal PT and the two steroid injections intended to treat his shoulder were themselves significantly painful. *Id.* at ¶¶ 4 -5. The shoulder injury also disrupted his sleep, personal relationships, and recreational activities specifically tennis. *Id.* at ¶¶ 4 – 8.

## B. Analysis

The above-summarized medical records establish that Petitioner's SIRVA was mild overall. While he sought prompt medical attention, his early pain was moderate to mild, and intermittent. His initial ROM and strength deficits were mild. He was assessed with an inflammatory reaction to the flu shot, tendinitis, and impingement. He did not develop adhesive capsulitis. No imaging or surgical intervention occurred. His formal treatment course was conservative – centering on primary care and orthopedics consults, prescription and OTC NSAIDs, two steroid injections, and 29 PT sessions over approximately three months. PT helped his pain levels and function, and he self-discharged from PT just over six months post-vaccination – meaning his treatment course lasted barely more than six month from onset.

---

[10] Previously in May 2020, Petitioner addressed the treatment course for his left shoulder injury, but he did not address any personal circumstances (apart from the PT initial evaluation note of his inability to play tennis). *See generally* Ex. 1.

[11] Petitioner was employed full-time as an environmental consultant, which involved sedentary desk work. Ex. 8 at 8.

Petitioner requests a pain and suffering award of $77,500.00 – slightly more than what was awarded in *Bordelon*, *Attig*, and *Kim*.[12] But Respondent maintains that in each of those cases, the SIRVA was established to have disrupted family caretaking obligations. Response at 7 – 10 (citing *George v. Sec'y of Health & Hum. Servs.*, No. 18-0426V, 2020 WL 4692451, at *3 (Fed. Cl. Spec. Mstr. July 10, 2020) (reasoning that the pain and suffering award may be adjusted upwards in light of "confounding variables… e.g., greater pain, increased length of symptoms, difficulty caring for very young children and an elderly parent")).

In reply, Petitioner suggests that in fact such a variable (disruption of family life) exists, since his wife had given birth to their child "*several months prior to his SIRVA.*" Reply at 4 (emphasis added), citing Ex. 11 at ¶ 6 (Petitioner's recollections of caring for his child before versus after the SIRVA). However, the medical records establish a different, more logical chronology. To reiterate, Petitioner's SIRVA onset was in September 2020. In November 2020, he received a pertussis vaccine in anticipation of his child's birth. His injury improved over the subsequent months, and on February 25, 2021, he denied difficulty holding his newborn child. *Accord* Ex. 11 at ¶ 6 (listing a 2021 date of birth).[13]Within the next month, the orthopedist assessed that his shoulder was "dramatically" improved, and he self-discharged from PT. Thus, Petitioner's asserted "confounding variable" was not present at the injury outset or during the majority of the active treatment course – unlike in *Bordelon*, *Attig*, and *Kim*.[14] Those cases are also difficult comparisons in light of the noted gaps in treatment – which meant shorter *active treatment courses,* but also longer *total documented injury courses.*

---

[12] Citing *Bordelon v. Sec'y of Health & Hum. Servs.*, No. 17-1892V, 2019 WL 2385896 (Fed. Cl. Spec. Mstr. Apr. 24, 2019); *Attig v. Sec'y of Health & Hum. Servs.*, No. 17-1029V, 2019 WL 1749405 (Fed. Cl. Spec. Mstr. Feb. 19, 2019); *Kim v. Sec'y of Health & Hum. Servs.*, No. 17-0418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018).

[13] The Reply Brief states that Petitioner's statement at Ex. 11 contains a "typographical error" in listing his child's birth in 2021. But the medical records are detailed and specific in establishing the child's birth in that year. It appears more likely than not that Petitioner was instead incorrect in recalling caring for his child prior to the SIRVA onset.

[14] Petitioner – like many other individuals who have sustained SIRVAs – has established that his injury caused some disruptions in ADLs (including sleep, self-care, personal relationships, and recreational activities). He had to adjust his work schedule to accommodate medical appointments, particularly PT approximately twice a week for 3.5 months – but the injury did not impact his ability to perform his desk job. I find that these circumstances are not particularly "confounding" either.

Respondent supports a lower award - $67,500.00 - on the grounds that this case is comparable to *Sakovits*, *George*, *Dagen*, and *Johnson*. Response at 9.[15] Not all of these comparables are in fact helpful for Respondent. For example, Petitioner persuasively distinguishes his own prompt presentation for medical treatment (just 18 days post-vaccination) from the *Sakovitz* petitioner's initial 3.5-month delay in seeking medical treatment, which suggested that the pain for the claimant in that latter case was initially manageable (not "notably severe"). *Sakovitz*, 2020 WL 3729420, at *3. And unlike Petitioner, the *Sakovitz* petitioner *declined* a second steroid injection. *Id.*

Nevertheless, Respondent's other cited cases are indeed similar, in that each featured early medical attention, prescription pain medications, and physical therapy; acceptance of one steroid injection several months into the course; and pain and suffering documented for approximately six months. Only the fact of Petitioner's receipt of a second steroid injection warrants a slight upward adjustment in the award from Respondent's comparable cases. Reply at 3 (citing Ex. 11 – Petitioner's Second Sworn Statement at ¶ 5 (stating that each injection was "extremely painful" for several days). **Overall, I find that Petitioner's actual pain and suffering warrants an award of $70,000.00.**

### Conclusion

Based on the record as a whole and the parties' arguments, I award Petitioner a lump sum payment of **$71,247.78, representing $70,000.00 for actual pain and suffering,[16] plus $1,247.78 for actual unreimbursable expenses**.[17] This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[18]

---

[15] *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420 (Fed. Cl. Spec. Mstr. June 4, 2020) (awarding $68,000.00 for actual pain and suffering); *George v. Sec'y of Health & Hum. Servs.*, No. 18-0426V, 2020 WL 4692451 (Fed. Cl. Spec. Mstr. July 10, 2020) ($67,000.00); *Johnson v. Sec'y of Health & Hum. Servs.*, No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021) ($65,000.00); *Dagen v. Sec'y of Health & Hum. Servs.*, No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019) ($65,000.00).

[16] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[17] Both parties have stipulated to the expenses. Brief at 28; Response at 2, 10.

[18] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master